**ATTACHMENT C**
**AFFIDAVIT**

I, William G. Childers, being duly sworn do hereby depose and state as follows:

1.       I am a Special Agent with the Department of Homeland Security, Homeland

Security Investigation (HSI), and have been so employed since June 2003.  Prior to my present

employment, I was employed as a United States Border Patrol Agent, for approximately seven

years. I am a graduate of the Federal Law Enforcement Training Center, HSI and Border Patrol

Academies.  I have significant experience in and have received specialized training in criminal

investigations, including but not limited to, child exploitation and child pornography, improper

importation/exporting of goods, immigration violations, and financial fraud.

2.       The information in this affidavit is based on my personal knowledge as well as

information received from other law enforcement agents, individuals, documents, and sources of

information.  The purpose of this affidavit is to develop probable cause to obtain search warrants.

This affidavit does not contain each and every fact know to agents involved in this investigation.

**INTRODUCTION**

3.       An ongoing investigation by special agents (Agents) of Homeland Security

Investigations (HSI) has developed probable cause to believe (1) that Father Lenin VARGAS-

GUTIERREZ (Father VARGAS), pastor of St. Joseph Parish, Starkville, Mississippi (St. Joe

Parish) knowingly devised schemes for obtaining money by means of false and fraudulent

pretense, through the use of wire communications in interstate commerce, in violation of Title

18, United States Code section 1343; and that the Diocese of Jackson, having knowledge of the

commission of the above referenced felony, concealed and did not as soon as possible make

known the same to some judge under the United States, in violation of Title 18, United States

1

Code section 4 (the "Target Offenses").  Based on interviews with confidential sources, records checks and verification, your Affiant knows that:

      A.     The Catholic parishes in the approximate Northern two/thirds of the State of Mississippi are under the jurisdiction of the Diocese of Jackson.

      B.     Parishes within the Diocese of Jackson operate under the guidance of Diocese of Jackson, including the Bishop of the Diocese of Jackson, Joseph Kopacz.  For instance, parishes within the Diocese of Jackson, including St. Joe Parish, continually report their financial standing to the Diocese of Jackson.

      C.     The Catholic Diocese of Jackson, Mississippi (the "Diocese of Jackson") office building is located at 237 East Amite Street, Jackson, Mississippi.

      D.     Diocesan parish priests within the Diocese of Jackson take a vow of obedience to the Bishop of the Diocese of Jackson.  The Diocese of Jackson pays the diocesan parish priests and provides health benefits for diocesan parish priests, among other benefits.

      E.     Father Lenin VARGAS is a priest in the Diocese of Jackson, and is the pastor of St. Joseph Catholic Church, located at 607 University Drive, Starkville, Mississippi.  St. Joseph Catholic Church consists of three buildings.  A church building and, facing the church from University Drive, a work building to the left of the church and another work building behind the church.

      F.     VARGAS and Father Rusty Vincent maintain, control, and have access to a residence at 15 Middleton Court, Starkville, Mississippi.

    4.    On or about September 5, 2018, Agents met with Confidential Informant No. 1 (CI No. 1).  CI No. 1 has over a decade of experience with the Diocese of Jackson and has provided reliable information to law enforcement, which has been corroborated by Agents. On or

2

about August 31, 2018, Agents met with Confidential Informant No. 2 (CI No. 2). CI No. 2 has over five years of experience with the Diocese of Jackson and has provided reliable information to law enforcement, which has been corroborated by Agents. On or about September 5, 2018, Agents met with Confidential Informant No. 3 (CI No. 3). CI No. 3 has been active in St. Joe Parish and has donated money to Father VARGAS. CI No. 3 provided reliable information to law enforcement, which has been corroborated by Agents. On or about September 4, 2018, Agents met with Confidential Informant No. 4 (CI No. 4). CI No. 4 has over a decade of experience with the Diocese of Jackson and has provided reliable information to law enforcement, which has been corroborated by Agents. On or about August 30, 2018, Agents met with Confidential Informant No. 5 (CI No. 5). CI No. 5 has over a decade of experience with the Diocese of Jackson and has provided reliable information to law enforcement, which has been corroborated by Agents.

## ST. JOE PARISH

5.      Father  VARGAS is the Pastor of St. Joe Parish, and has been for approximately five years. Father Rusty Vincent is the associate pastor. Father Vincent and VARGAS live together in a residence located at 15 Middleton Court, Starkville, Mississippi. In addition to the priests, St. Joe Parish has two deacons, John McGinley and Jeff Artigues. Will White was the past St. Joe Parish bookkeeper. Kazie Richardson was hired in the summer of 2018, and is the new St. Joe Parish bookkeeper. Demi Dunne is the secretary for the parish.

## 2014 HOSPITAL VISIT
### and
## ALLEGED CANCER DIAGNOSIS

6.      CI No. 1 reported that in late 2014 Father VARGAS went to the Oktibbeha

County Hospital Regional Medical Center for breathing trouble.  VARGAS stayed in the hospital

for several days.

7.      After VARGAS was discharged, he invited CI No. 1 to dinner and told CI No. 1

that he was diagnosed with a rare form of cancer: Walden Strom's macroglobulinemia

lymphoma.  VARGAS stated that the treating physicians had never dealt with such cancer in a

patient as young as VARGAS.  VARGAS then informed CI No. 1 that the Diocese of Jackson

was sending him to Canada for treatment because the Canadian hospital was one of few hospitals

that dealt with this type of rare cancer.

8.      According to CI No. 1, CI No. 2 and CI No. 3, after VARGAS was released from

the Oktibbeha County Hospital in late 2014, he began to announce from the pulpit that he had

cancer and that he was going to Canada for treatment.  VARGAS announced that he had cancer

numerous times to St. Joe parishioners.

## RAISING MONEY FOR CANCER RELATED EXPENSES
## "GOFUNDME"

9.      After going to the Oktibbeha County Hospital in late 2014, but before going to

Canada, CI No. 1 and CI No. 2 stated that a "GoFundMe" account was established for

VARGAS' benefit, to cover cancer medical expenses. CI No. 1 believed "Roberto" was involved

in starting the GoFundMe.

10.      CI No. 1 knows that the GoFundMe account received money for VARGAS'

cancer treatment.  CI No. 4 confirmed that VARGAS raised money for his alleged cancer

treatment through the GoFundMe account as well as through private donations.

4

11.    Agents subpoenaed information from the subject GoFundMe account, and corroborated the information provided by the confidential informants. Agents confirmed that on February 25, 2015, a GoFundMe account was created for VARGAS' benefit by a Roberto Gallard. The GoFundMe account was entitled "Lenin's Medical Fund." GoFundMe documents showed that 57 people donated $9,210 for VARGAS.

12.    The GoFundMe webpage displayed a background story for VARGAS, stating that he:

- Was born in Michoacan, Mexico;
- Decided to become a priest during his last year of medical school;
- Moved to Mississippi after ordination;
- Was diagnosed with cancer (Waldenstrom macroglobulinemia or lymphplasmactic lymphoma) in October of 2014.

13.    The GoFundMe narrative further stated that while VARGAS has medical insurance, the costs associated with his cancer were high and that the bills continued to be significant, and that donated funds will be deposited into VARGAS' account. This narrative is contradicted by CI No. 2, CI No. 4 and CI No. 5, who all confirm that the Diocese of Jackson's medical coverage for priests is very good, that such coverage effectively "covers everything," and that VARGAS' medical expenses were covered. CI No. 2, CI No. 4 and CI No. 5 reiterated that any treatment VARGAS would have received in Canada would be fully covered by the Diocese of Jackson. The narrative contained a disclaimer that the Diocese of Jackson was not responsible for this campaign.

## VARGAS
## DOES NOT HAVE CANCER

14.     However, CI No. 2 learned from a reliable source of information that VARGAS did not have cancer, and that he was in fact diagnosed with HIV in 2014. This information was forwarded to Bishop Kopacz of the Jackson Diocese in 2015.

15.     Information provided by CI No. 2 was corroborated by Agents, who subpoenaed VARGAS medical records from Oktibbeha County Hospital Regional Medical Center (OCHRMC). The records confirmed that VARGAS was admitted to OCHRMC on 09/22/2014 with pneumonia. On 09/26/2014, the doctor noted that while VARGAS' condition was not worsening, it was not improving either. The doctor ordered a HIV test. On 09/28/2014, VARGAS checked out of the hospital without seeing his doctor.

16.     On 07/16/2016, VARGAS went to OCH Medical Associates for right knee pain. VARGAS reported that he had HIV. On 11/07/16, VARGAS returned to OCH Medical Associates and reported that he sees a nurse practitioner in Tupelo for HIV, and that his HIV was discovered when he had pneumonia. On 12/02/16, VARGAS went to OCHMRC for a headache, and reported that he was diagnosed with HIV in 2013.

17.     In addition to the above reviewed medical records, there were other visits to hospitals and clinics. No medical report ever mentioned any diagnosis or treatment for cancer, or any cancer related issues.

## THE SOUTHDOWN FACILITY
### and
## THE COVER-UP

18.     In April of 2015, VARGAS left St. Joe Parish and went to Canada for treatment. CI No. 1 confirmed that VARGAS informed St. Joe parishioners during Mass that he was going

to Canada for cancer treatment. VARGAS then proceeded to collect money from parishioners to cover his alleged cancer expenses.

19.     CI No. 2 learned from the same reliable source of information that in April of 2015 VARGAS did *not* go to Canada for cancer treatment. VARGAS actually went to Southdown Institute of Toronto, Canada. According to the Diocese of Jackson, the Southdown Institute of Toronto, Canada, was founded specifically to address the needs of religious and clergy around mental health and addiction. CI No. 4 confirmed that VARGAS went to the Southdown facility in Canada, and stated it was, among other things, a sexual addiction facility for priests.

20.     In March of 2015, the Diocese of Jackson furthered VARGAS' cancer story by sending out an email to priests in the diocese. The email is from Father Kevin Slattery, the Vicar General of the Diocese of Jackson. The subject line states: "Announcement about Father Lenin VARGAS." CI No. 4 and CI No. 5 believe that the Diocese of Jackson was aware of VARGAS' HIV diagnosis when he was sent to Canada. The email provides as follows:

> Fr. Lenin VARGAS had told the people in Starkville about his illness and as the news has spread, some of what he told has been miscommunicated. I asked if he would share something with the priests, and lay ecclesial ministers of the Diocese. He has sent me the following.
>
> From Fr. Lenin:
>
> "My dear brothers and sisters,
>
> As some of you might have heard, last October 2014, I ended up in the hospital due to what seemed to be pneumonia. However, after a week of tests the results came back that I have Lymphoplasmascytic lymphoma. I've been under a treatment since then.
>
> You may have heard from someone here in Starkville or a student from your parish studying at Mississippi State, as a few weeks ago I shared this information with the congregation. I did so after prayerful consideration.

7

Of the various types of lymphomas the one I have is treatable. Thus far it has been with good results. A drawback has been that I have developed diabetes as a result of the treatment.

In the near future, I am planning to undergo a more extensive treatment. This will mean that I will be away for a few months. I will need to recuperate before being able to return to my duties here at the parish. But the details have not all been worked out yet.

I would sincerely appreciate your prayers and support on this time of coping with this.

I trust the plans God has for me and believe they are better than mine.

Thank you for your concern and support.

Sincerely yours in Christ,
Fr. Lenin VARGAS

21.     The Diocesan email stated that VARGAS would be leaving for extensive treatment in the near future, and that he would be gone for a few months. What the email failed to state was that VARGAS was not going away for cancer treatment. As a result, VARGAS continued to raise money for his supposed cancer treatment. Your affiant believes the email was sent in order to perpetuate the cancer story, to hide VARGAS' HIV condition and protect the Diocese of Jackson from negative publicity. Again, according to CI No. 2, CI No. 4 and CI No. 5, any treatment VARGAS received in Canada was paid for by the Diocese of Jackson. While VARGAS was gone to the Southdown facility, the Diocese of Jackson also assigned numerous priests to substitute, or say Sunday Mass, for VARGAS at St. Joe Parish.

## SPENDING MONEY DONATED FOR CANCER EXPENSES
## "WEPAY"

22.     "WePay" is a third party payment processor used to wire funds to beneficiaries of GoFundMe accounts. Agents received information from WePay concerning the VARGAS GoFundMe account. WePay identified Lenin VARGAS, DOB 07/10/72, of Starkville, Mississippi, as the founder of the account, as well as the following information:

8

-     Account Name:     John's Retirement Account
-     Administrator:     Lenin VARGAS
-     Founder:     Lenin VARGAS
-     App:     GoFundMe
-     Fees:     $285.93
-     Total Payment Volume:     $8,797.00

23.    WePay records revealed the transaction history for funds wired out of VARGAS' GoFundMe account, identifying four (4) withdrawals wired from the GoFundMe account to VARGAS' bank account. Each of the payments represented the transmission of money through an interstate wire communication, as follows:

-     $7,179.22    on    03/24/15
-     $1,102.80    on    03/30/15
-     $91.80    on    04/06/2015
-     $91.50    on    04/13/15

The above referenced funds were wired to VARGAS' Regions bank account as part of a scheme to defraud the parishioners of St. Joe Parish. In addition, on 04/13/15, a $2,300 "Love Offering" was giving to VARGAS from the Corpus Christi Catholic Church in Macon, Mississippi. Between March 21st and April 21st, 2015, $20,021.69 was deposited into VARGAS' Regions account. During the same period, $13,476.18 was withdrawn from VARGAS' account. VARGAS spent the donated funds largely on personal expenses. None of the withdrawals were for medical expenses.

24.    Six months later, on 11/24/15, St. Joe Parish wrote VARGAS a check for $21,500. Parish records reveal that $19,500 of the $21,500 was for "Father's Health Donation." Parish records also confirm that St. Joe Parish had received numerous individual donations for Father VARGAS' Medical Fund. St. Joe Parish collected the donations as part of VARGAS' scheme to defraud parishioners of St. Joe Parish. The parish accumulated the individual donations, and paid VARGAS in a lump sum. VARGAS deposited the $21,500 into his Regions

9

account on the same day.  Between November 19th and December 21st, 2015, $33,574.04 was

deposited into VARGAS' Regions account; $32,651.50 was withdrawn from the Regions

account during the same time frame.  VARGAS spent the donated funds largely on personal

expenses.  None of the withdrawals were for medical expenses.  CI No. 2 and CI No. 5 stated

that as of 2018, VARGAS was still claiming he had cancer.

### RAISING MONEY FOR AN
### ALLEGED ORPHANAGE IN MEXICO

25.     CI No. 1 and CI No. 2 know that VARGAS also raised money from parishioners

for an orphanage in Mexico.  As with the cancer donations, VARGAS spent the money he raised

on personal expenses.  VARGAS solicited money for Mexican orphanages, at least in part, as

part of a scheme to defraud the parishioners of St. Joe Parish.  VARGAS utilized interstate wire

communications to spend part of the donated money.

26.     CI No. 1, CI No. 2 and CI No. 3 know that VARGAS raised money for a Mexican

orphanage during Mass.  CI No. 1 reiterated that VARGAS collected money for a Mexican

orphanage during the children's collection and during the second collection, both of which occur

during Sunday Mass.  CI No. 1 also recalled that VARGAS met with the St. Joe Parish men's

group to raise money for a Mexican orphanage.

27.     CI No. 1 and CI No. 2 explained that VARGAS' orphanage story evolved over

time.  VARGAS initially said that the orphanage was located in the slums of the City of Morelia.

He then said that the orphanage was run by an ex-nun, who moved homeless kids into her house.

28.     CI No. 1, CI No. 2 and CI No. 3 have been affiliated with St. Joe parish for years,

and are not aware of VARGAS ever identifying the specific name of the orphanage, or ever

giving a specific address or ownership of the orphanage.  VARGAS never provided any letters or

correspondence from a Mexican orphanage; never provided any receipts for money allegedly

given to any Mexican orphanage; and never brought pictures or documents identifying how the monetary donations were used.

29.     CI No. 1 and CI No. 2 also know that VARGAS solicited money from individual parishioners, grooming parishioners before asking them for donations. VARGAS would take the target parishioner out to lunch or dinner, and always paid for the meal. Meal expenses were ultimately paid by St. Joe Parish. After ingratiating himself, VARGAS would then give the parishioner the opportunity to donate to his cause. CI No. 3 confirmed that after he/she gave a $5,000 check to St. Joe Parish, VARGAS called her/him and asked if he could use the money for an orphanage in Mexico. CI No. 3 agreed.

30.     CI No. 2 knows that the Diocese of Jackson has rules for priest raising money for pet projects. The parish priest must present a project explanation to and obtain the approval from diocese. The priest should then present the plan and obtain the approval of the parish counsel. CI No. 2 does not believe VARGAS followed diocesan procedure when soliciting money from parishioners for his pet projects.

## RAISING MONEY FOR AN
## ALLEGED CHAPEL IN MEXICO

31.     CI No. 1 and CI No. 2 know that VARGAS also raised money from parishioners for a chapel in Mexico. CI No. 1 recalls VARGAS soliciting money for a Mexican Chapel during Mass. CI No. 1 heard VARGAS explain that there is a mountain near Morelia, Mexico, where locals go to pray. VARGAS wanted to build a Chapel for the locals on the mountain. VARGAS even had a Mississippi architect draw up plans. Your affiant believes that VARGAS solicited the above referenced funds as part of a scheme to defraud the parishioners of St. Joe Parish. VARGAS utilized interstate wire communications to spend part of the donated money.

## SPENDING DONATED MONEY

32.     After VARGAS solicited money from St. Joe parishioners, CI No. 1 and CI No. 2

know that some parishioners gave money directly to VARGAS.  Other parishioners utilized St.

Joe parish to donate money to VARGAS.  In such cases, St. Joe parishioners would give a check

to St. Joe parish, and note on the check that the donation was for an "orphanage" or a "chapel".

St. Joe Parish would accept the donation on behalf of VARGAS, and deposit the money into a St.

Joe Parish account.  The parish would then accumulate the funds on behalf of VARGAS, and

then write him a check.  VARGAS would deposit the St. Joe Parish check into his personal

account.  After VARGAS received the donated money, he would spend it largely on personal

expenses.  Information provided by CI No. 1 and CI No. 2 was corroborated by Agents when

they reviewed St. Joe Parish and VARGAS bank records.

33.     CI No. 1 knows that the St. Joe Parish accounting system had specific line item

designation for donations to VARGAS, and that the Parish would cut VARGAS a check for such

donations.  Paper records concerning St. Joe Parish projects and financial data is kept within

offices on St. Joe Parish campus.  The St. Joe Parish accounting system is kept on a computer

within offices on St. Joe Parish campus.  St. Joe Parish financial data is also forwarded to the

Diocese of Jackson, and kept on the diocese's accounting system, housed at the diocesan office

in Jackson, Mississippi.

34.     On 06/24/14, St. Joe Parish wrote a check, payable to Lenin Vargas, for $5,300.

The check noted that its purpose was for "orphanages."  On 06/25/14, St. Joe Parish wrote a

check to Vargas for $800.  The check again noted that its purpose was an "orphanage."

VARGAS deposited the checks into his Regions account.  Between 06/20/14 and 07/22/14,

$8,589.00 was deposited into VARGAS' Regions account; $6,671.98 was withdrawn.  The

withdrawn money was largely spent for personal expenses, with no identifiable payments to an "orphanage." There were numerous payments for card purchases from Amazon Marketplace, representing interstate wire transmissions.

35.    On 02/12/16, St. Joe Parish wrote a check, payable to Lenin Vargas, for $1,093.00. The check noted that its purpose was "orphanage help." Between 02/01/16 and 02/29/16, $4,681.34 was deposited into VARGAS' Regions account; $2,000.00 was withdrawn. The withdrawn money was largely for personal expenses, with no identifiable payments for "orphanage help."

36.    On 12/24/16, Parishioner No. 1 wrote a check, payable to Father Lenin Vargas, for $1,000. The check noted that its purpose was a "Mexico Chapel." VARGAS deposited the check into his Regions account on 12/30/16. Between 12/21/16 and 01/20/17, $10,429.56 was deposited into VARGAS' Regions account; $8,506.29 was withdrawn. The withdrawn money was largely for personal expenses, with no identifiable payments for a Mexican Chapel. Numerous payments to American Express, PayPal and Amazon represented interstate wire transmissions.

37.    On 06/29/17, Parishioner No. 2 wrote a check, payable to Father Lenin Vargas, for $10,000. The check noted that its purpose was a "Church at El Cristal, Mexico." VARGAS deposited the check into his Regions savings account on 06/30/17. Between 06/01/17 and 06/30/17, $12,700.00 was deposited into VARGAS' Regions savings account; $2,390.00 was withdrawn and deposited into VARGAS' checking account. Between 06/01/17 and 10/31/17, VARGAS deposited $17,400.00 into this account; $14,050.59 was withdrawn and deposited into VARGAS' checking account. After the above referenced withdrawn money was transferred to

13

VARGAS' checking account, it was spent largely for personal expenses, with no identifiable payments for a Church at El Cristal, Mexico.

## THE VISIT TO
## VICAR GENERAL KEVIN SLATTERY
## AND
## BISHOP JOSEPH KOPACZ

38.     CI No. 1, CI No. 2 and CI No. 5 noted that VARGAS spent excessively, especially by priest standards. Concerns about VARGAS' honesty also became an issue. For instance, VARGAS told CI No. 1 and CI No. 2, and numerous others, that he was a medical doctor in Mexico. Neither believes he is a medical doctor. VARGAS told CI No. 1 that a Mexican hospital actually put him in charge of its trauma unit while he was still in medical school – because he was so good. VARGAS also told CI No. 1 that the Vatican's Papal Nuncio called him [VARGAS] and asked if he would consider being the Bishop for the Diocese of Jackson. Due to mounting concerns, CI No. 1 and CI No. 2 know that in October of 2017, Bishop Joseph Kopacz and Vicar General Kevin Slattery met with clergy about the spiritual and financial wellbeing of St. Joe Parish. CI No. 2 knows that St. Joe parishioners also emailed Bishop Kopacz about the spiritual and financial wellbeing of St. Joe Parish.

39.     At the October meeting, Bishop Kopacz and Vicar General Slattery were informed by concerned clergy that VARGAS was raising significant amounts of money from parishioners for cancer treatment and unverified charitable causes. The Bishop and Vicar General were told that VARGAS was making numerous trips to Mexico, and that money was missing from the parish coffers.

40.     The trips to Mexico were troubling because, according to CI No. 1 and CI No. 2, VARGAS utilized wire communications, via Skype, to communicate with a Mexican individual known as Sergio Picon. VARGAS' skypes with Sergio occurred on a daily basis. Both believe

14

Sergio Picon resides in Morelia, Mexico. Research on social media identified Sergio Picon as owning a bar in Morelia, Mexico, named "Heaven and Hell." Social media also noted that VARGAS attended the bar's grand opening in the summer of 2018.

41.     Bishop Kopacz and Vicar General Slattery told the concerned clergy that they appreciated the visit, and that they would look into it. Neither the Bishop nor the Vicar General ever followed up with the concerned clergy or with the St. Joe Parish counsel about the meeting.

42.     CI No. 2 confirmed that Vicar General Slattery was aware that VARGAS was soliciting money from St. Joe Parishioners for a Mexican orphanage, and that the resulting donations were being deposited into the Parish account and then forwarded to VARGAS. CI No. 2 confirmed that Vicar General Slattery knew that the orphanage story was at least in part a ruse created by VARGAS to get money. Vicar General Slattery told CI No. 2 that all would be better off if VARGAS did not come back to Mississippi after his sabbatical.

43.     A diocesan audit was conducted of St. Joe Parish in early 2018. CI No. 2 knows that VARGAS told Parish personnel that the audit was merely routine.

## VARGAS CONTINUED TO SOLICIT AND SPEND
## SPEND DONATED MONEY

44.     After the October 2017 meeting with Bishop Kopacz and Vicar General Slattery, VARGAS continued to solicit money from parishioners, especially the vulnerable elderly. Little was done by the Diocese of Jackson to protect parishioners. For instance, Parishioner No. 3 is an elderly St. Joe parishioner that uses a walker. His/her handwriting is noticeably weak and frail. It appears that Parishioner No. 3 may have written his/her first check to VARGAS on 09/25/16, for $1,100. Parishioner No. 3's donations continued.

45.     On 10/08/17, Parishioner No. 3 wrote a check, payable to Father Lenin Vargas, for $3,000. The check noted that its purpose was "For a chapel in Mexico." VARGAS

15

deposited the check into his Regions account on 10/10/17. Between 09/21/17 and 10/20/17, $8,451.77 was deposited into VARGAS' Regions account; $8,224.33 was withdrawn. The withdrawn money was largely spent for personal expenses, with no identifiable payments to a chapel in Mexico. Payments from VARGAS' account to PayPal, Nissan and Amazon represented interstate wire transmissions.

46.     On 11/08/17, Parishioner No. 3 wrote a check, payable to Father Lenin Vargas, for $3,000. The check noted that its purpose was "For chapel in Mexico." On the same day, Parishioner No. 3 wrote another check to Vargas for $300. VARGAS deposited the checks into his Regions account on 11/10/17. Between 10/21/17 and 11/20/17, $8,655.41 was deposited into VARGAS' Regions account; $5,940.68 was withdrawn. The withdrawn money was largely for personal expenses, with no identifiable payments to a chapel in Mexico. Payments from VARGAS' account to American Express and Nissan represented interstate wire transmissions.

47.     On 02/22/18, Parishioner No. 3 wrote another check, payable to Father Lenin Vargas, this time for $10,000. The check noted that its purpose was "For charity." Parishioner No. 3 had to withdraw, via a wire communication, $10,000 from his/her retirement account to cover the check. VARGAS deposited the check into his Regions account on 02/23/18. Between 02/17/18 and 03/21/18, $13,497.67 was deposited into VARGAS' Regions account; $14,445.24 was withdrawn. Again, the withdrawn money was largely spent for personal expenses, with no identifiable charitable payments. Payments from VARGAS' account to American Express represented interstate wire transmissions.

48.     VARGAS continued to solicit money from Parishioner No. 3. On 04/19/18, Parishioner No. 3 wrote a check, payable to Father Lenin Vargas, for $600. On 05/02/18,

Parishioner No. 3 wrote a check, payable to Father Lenin Vargas, for $1,000.  On 05/24/18, Parishioner No. 3 wrote a check, payable to Father Lenin Vargas, again for $500.

49.      On 06/13/18, Parishioner No. 3 wrote a check, payable to Father Lenin Vargas, for $20,000.  The check noted that its purpose was "For chapel in Mexico."  Parishioner No. 3 wrote another check to VARGAS on 06/13/18 for $400.  Parishioner No. 3 had to withdraw $21,000 from his/her retirement account to cover the checks.  VARGAS cashed the $20,000 check.

50.      VARGAS' Regions Bank account identifies payments to PayPal.  Through legal process, Agents received information from PayPal related to VARGAS.  PayPal identified VARGAS as a user of record and identified fr.leninvargas@mac.com as the his email address, an email address that Agents knew was associated with VARGAS.  The account used most by VARGAS included the following in the "Registration Information":

| | |
|---|---|
| First Name: | Lenin |
| Last Name: | Vargas |
| DOB: | 10-Jul-72 |
| Email: | fr.leninvargas@mac.com |
| Account Type: | Personal Verified |

51.      On 08/17/18, utilizing a wire communication, there was a PayPal payment from VARGAS' above referenced account to SuccessfulMatch.com.  The "Type" of payment was identified as a "Recurring Payment Sent."  The "Subject" portion of the payment read "PS Membership: Monthly Membership 29.95 …", an interstate wire communication.  According to internet searches, Successfulmatch.com is a dating website.  Wikipedia describes "Successful Match" as "a provider of specialized dating networks helping customers find and interact with others within their specific niche…"  One of Successfulmatch's niche dating sites is "Positive Singles."  Successfulmatch's own website describes Positive Singles as the "largest STD dating

site for people who are living with herpes, **HIV/AIDS**, HPV or other STD's to find love, friendship and support." Agents believe that VARGAS' "PS Membership" at SuccessfulMatch referred to the "Positive Singles" niche dating site, further evidencing VARGAS' HIV diagnosis.

## CONCERNS ABOUT SUNDAY COLLECTIONS

52.     CI No. 1 and CI No. 4 know that St. Joe Parish personnel became concerned that VARGAS was stealing money from Sunday collections. Money that was identified as being collected on Sunday was no longer present when the collection were counted on Monday.

53.     CI No. 1 knows that the Diocese of Jackson was contacted about the diocesan standard operating procedure for collecting and processing Sunday Collections. CI No. 1 knows that when VARGAS found out that the diocese was contacted about whether or not St. Joe Parish was following Sunday collection protocol, he became angry. VARGAS opposed putting a camera in the room that contained Sunday collections.

## EVIDENCE LOCATIONS

54.     In the instant case, there is probable cause to believe that VARGAS fraudulently asserted that he had cancer in order to solicit money for his alleged cancer expenses from St. Joe parishioners ("The Cancer Scheme"). Money and communications concerning The Cancer Scheme were transmitted through interstate wire communications. Based on training and experience, and participation in this investigation, your affiant asserts that there is probable cause to believe that evidence of The Cancer Scheme and Target Offenses should be located in the three St. Joe Parish buildings, in VARGAS' residence, and Diocese of Jackson offices.

55.     In the instant case, there is probable cause to believe that VARGAS fraudulently solicited money from St. Joe parishioners for an orphanage and chapel in Mexico ("The Orphanage/Chapel Scheme"). Money and communications concerning The Orphanage/Chapel

Scheme were transmitted through interstate wire communications.  Based on training and experience, and participation in this investigation, your affiant asserts that there is probable cause to believe that evidence of The Orphanage/ Chapel Scheme and Target Offenses should be located in the three St. Joe Parish buildings, in VARGAS' residence, and Diocese of Jackson offices.

56.     Based upon my training and experience, and participation in the investigation of the Target Offenses, your affiant knows that:

A.     In order to conceal profits from fraudulent schemes, of the type described herein, violators often spend fraudulently obtained money and/or title assets through the utilization of fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by law enforcement authorities. Even though these assets are in names other than the perpetrator, the perpetrator actually owns and continues to use these assets, and exercise dominion and control over them.

B.     It is common for those who participate in fraudulent schemes, of the type described herein, to maintain financial records, books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the wiring and spending of fraudulently obtained money.  That the aforementioned financial records, books, records, receipts, notes, ledgers, etc., are maintained where the violators have ready access to them, including their residences, offices, vehicles, storage units and/or other locations over which they maintain dominion and control.

C.     It is common for those who participate in fraudulent schemes, of the type described herein, to maintain evidence pertaining to obtaining, secreting, transfer, concealment, and/or expenditure of illegally obtained money, such as: currency, financial instruments,

precious metals, and gemstones, jewelry, books, records, invoices, receipts, bank statements, and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by violators within their offices, residences, vehicles, storage units or other locations over which they maintain dominion and control.

D.      It is common for those who participate in fraudulent schemes, of the type described herein, to utilize Electronic Devices, such as cell phones, computers, facsimile machines, text messaging devices, email, and telephone answering machines, to generate, transfer, record and/or store the information described herein.

E.      It is common for those who participate in fraudulent schemes, of the type described herein, to attempt to legitimize their illegally obtained money through various money laundering methods. To accomplish these goals, violators utilize entities and methods including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos and otherwise legitimate cash producing businesses.

F.      Currency transaction reports (CTR) are required to be completed and filed by financial institutions and businesses on currency transactions which exceeds $10,000.  It is common for CTR's to cause problems for those who participate in fraudulent schemes, of the type described herein, when they attempt to negotiate their illegal profits at financial institutions or businesses. In order to avoid CTR filings, violators often structure their currency transactions, that is, arrange a cash transaction exceeding $10,000 into smaller transactions so that no one transaction exceeds $10,000, or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

G.      It is common for those who participate in fraudulent schemes, of the type described herein, to at times become fearful that their spending habits will bring them under scrutiny of their employer, the Internal Revenue Service or other law enforcement agencies. In order to legitimize their spending, violators often file tax returns where the income reported is falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the violators in their office or residence.

H.      It is common for those who participate in fraudulent schemes, of the type described herein, to maintain cellular phones, computers, text messaging devices, books or papers which reflect the names, telephone numbers, addresses and/or electronic email addresses relating to the wiring or spending of the illegally obtained money;

I.      Those who participate in fraudulent schemes, of the type described herein, may take or cause to be taken photographs and videos related to the spending of the illegally obtained money, often related to asset purchases or travel.  These violators usually maintain these photographs and videos in their possession, or within their offices, residences, computers, cellular phones, vehicles, and/or other locations over which they maintain dominion and control;

J.      It is common for those who participate in fraudulent schemes, of the type described herein, to deposit and transfer wrongfully obtained money between financial institutions.  It is also common for such violators to make use of wire transfers, cashier's checks, and money orders to spend or transfer wrongfully obtained money.  Evidence of such financial transactions, including records from financial institutions and records relating to income and expenditures of money, would typically be maintained in a trafficker's office, residence and/or other locations over which they maintain dominion and control.

21

K.     VARGAS travels to Mexico and Canada several times a year.  It is common for those who participate in fraudulent schemes, of the type described herein, to travel to transport assets and currency derived from and/or related to the illegal activities. Such travel necessarily results in the generation of various travel documents for the traveler, which typically are also kept in their residences, other locations which they maintain dominion and control and vehicles.

57.     CI No. 2 knows that there are four (4) computers within the St. Joe Parish office building; VARGAS has a computer, the parish secretary has a computer, the campus minister has a computer, and Deacon Artigues has a computer.  CI No. 2 also knows that VARGAS has a Smartphone, and maintains a computer at his residence.  CI No. 1 and CI No. 2 know that St. Joe Parish records, including financial records, are stored on parish computers and in paper format within files and boxes.  CI No. 1 and CI No. 2 know that parish records are kept within the buildings on St. Joe campus.  Based on training and experience, and knowledge of this investigation, your affiant believes that St. Joe Parish and VARGAS' residence should maintain records and evidence of VARGAS's charitable projects and of VARGAS soliciting or collecting money from parishioners.

58.     CI No. 2, CI No. 4 and CI No. 5 confirm that individual parishes maintain detailed financial records.  CI No. 2 confirmed that parish bookkeeping is accomplished through a "Parish Soft" software package, which is connected to the Diocese of Jackson accounting system. CI No. 2 and CI No. 4 confirmed that St. Joe Parish provides monthly financial reports to the Diocese of Jackson via Parish Soft.  CI No. 4 confirmed that the Diocese of Jackson created a diocesan wide annual report, the Catholic Cathedratecum Report, based on parish finances.  St. Joe Parish and the Diocese of Jackson maintain St. Joe financial records, including

22

records of money donated to St. Joe Parish on behalf of VARGAS to cover his medical expense, to support Mexican orphanages, or to build chapels in Mexico. Based on training and experience, and knowledge of this investigation, your affiant believes that VARGAS may also possess evidence of his charitable projects and cancer diagnosis at his residence. St. Joe Parish and the Diocese of Jackson should also possess records concerning St. Joe Parish wiring money to Mexico and/or VARGAS' trips to Mexico and Canada. St. Joe Parish and the Diocese of Jackson possess records of the diocese's audit of St. Joe.

59.     CI No. 4 confirmed that the Diocese of Jackson is networked to its parishes. CI No. 4 and CI No. 5 state that the Diocese of Jackson, including Bishop Kopacz, often communicates with priests and parish personnel through the mail and the diocesan e-mail server, among other means. For instance, in March of 2015, the Diocese of Jackson sent an email to Diocesan priests concerning VARGAS' alleged cancer treatment. Based on training and experience, and knowledge of this investigation, your affiant believes that the Diocese of Jackson should maintain records or communications dealing with VARGAS' cancer treatment and conduct as pastor of St. Joe. The Diocese of Jackson should also have records of any notification to diocesan priests or St. Joe parishioners that VARGAS did not have cancer, if such records exist.

60.     CI No. 2, CI No. 4 and CI No. 5 confirm that medical care and benefits for priests within the Diocese of Jackson are coordinated through the Diocese of Jackson. CI No. 2, CI No. 4 and CI No. 5 confirm that the Diocese of Jackson is responsible for priest medical expenses, that Southdown is an addiction facility in Canada, and that the Diocese of Jackson would have paid for VARGAS' treatment at Southdown. The Diocese of Jackson, as well as individual parishes, maintain medical records on all priests within the Diocese of Jackson. Based on

23

training and experience, and knowledge of this investigation, your affiant believes that St. Joe

Parish, the Diocese of Jackson offices, and VARGAS' home should have records of VARGAS'

alleged cancer diagnosis and treatment; HIV diagnosis and treatment; as well as any payment

records and records pertaining to VARGAS' treatment at Southdown.

61.     CI No. 1 and CI No. 2 confirm that in late 2017 concerned clergy met with Bishop

Kopacz and Vicar General Slattery about the spiritual and financial wellbeing of St. Joe Parish.

The Bishop and Vicar General were notified of VARGAS soliciting money from parishioners for

cancer medical expenses and pet projects.   In addition to Bishop Kopacz and Vicar General

Slattery, CI No. 5 stated that the Diocese of Jackson also has a personnel review board, which

reviews issues and complaints dealing with priests.  CI No. 2, CI No. 4 and CI No. 5 confirm that

the Diocese of Jackson maintains detailed personnel records for all priests within the Diocese of

Jackson.  Based on training and experience, and knowledge of this investigation, your affiant

believes that the Diocese of Jackson maintains personnel files on VARGAS' stewardship of

donated money, as well as records of VARGAS soliciting money from parishioners for pet

projects or medical expenses.  The Diocese of Jackson should also possess records of any

notification to diocesan priests or St. Joe parishioners that VARGAS did not have cancer, if such

records exist.  The Diocese of Jackson should also have records of any plan to pay back

parishioners for money wrongfully solicited from them by VARGAS, if such records exist.

62.     Based on training and experience, and the instant investigation, your affiant

asserts that there is probable cause to believe that actual (i.e., paper), digital and electronic

evidence of the Target Offenses will be found in the St. Joe Parish office, the Diocese of Jackson

office, as well as VARGAS' residence.  Evidence and/or information related to the Target

Offenses includes:

A.      Any and all records and/or communications pertaining to VARGAS' alleged cancer diagnosis;

B.      Any and all records and/or communications pertaining to money raised for VARGAS' cancer treatment;

C.      Any and all records or communications pertaining to money solicited, donated or received for VARGAS' alleged cancer treatment;

D.      Any and all records and/or communications pertaining to VARGAS, St. Joe Parish or the Diocese of Jackson informing individuals that VARGAS had cancer;

E.      Any and all records or communications pertaining to VARGAS, St. Joe Parish or the Diocese of Jackson notifying individuals that VARGAS did not have cancer;

F.      Any and all records and/or communications pertaining to VARGAS, St. Joe Parish or the Diocese of Jackson reimbursing money obtained from parishioners to pay for VARGAS' alleged cancer treatment;

G.      Any and all records and/or communications pertaining to VARGAS' HIV diagnosis;

H.      Any and all records and/or communications pertaining to the VARGAS, St. Joe Parish or the Diocese of Jackson concealing The Cancer Scheme;

I.      Any and all records and/or communications pertaining to the VARGAS, St. Joe Parish or the Diocese of Jackson concealing the Orphanage/Chapel Scheme;

J.      Any and all records and/or communications pertaining to the VARGAS, St. Joe Parish or the Diocese of Jackson concealing the fact that VARGAS had HIV;

K.      Any and all records and/or communications pertaining to the VARGAS soliciting money from parishioners;

L.    Any and all records and/or communications pertaining to the VARGAS' charitable projects;

M.    Any and all records and/or communications identifying orphanages in Mexico that VARGAS wanted to support;

N.    Any and all records and/or communications pertaining to orphanages in Mexico supported by St. Joe Parish, parishioners of St. Joe Parish, or VARGAS;

O.    Any and all records and/or communications identifying a chapel in Mexico that VARGAS wanted to support and/or build;

P.    Any and all records and/or communications pertaining to St. Joe Parish, the parishioners of St. Joe Parish, or VARGAS contributing to the cost of building a Chapel in Mexico;

Q.    Any and all records and/or communications pertaining to St. Joe Parish or VARGAS wiring or in any way sending money to Mexico;

R.    Any and all records or communications pertaining to St. Joe Parish or VARGAS soliciting or receiving money to build a chapel in Mexico;

S.    Any and all records and/or communications pertaining to St. Joe parish or VARGAS receiving money for alleged orphanages in Mexico;

T.    Any and all records and/or communications from the Diocese of Jackson notifying VARGAS that he is not to seek private donations from parishioners;

U.    St. Joe Parish financial records from 2013 to present;

V.    Any and all records and/or communications concerning Father Lenin VARGAS' conduct as pastor or associate pastor in the Diocese of Jackson;

W.    Father VARGAS' personnel file;

26

X.     Any and all records and/or communications concerning the Diocese of Jackson audit of St. Joe Parish;

Y.     Any and all records and/or concerning VARGAS' treatment at the South Down medical facility;

Z.     Diocese of Jackson records and/or communications concerning VARGAS' medical insurance coverage;

AA.    Diocese of Jackson records and/or communications concerning any payment for VARGAS' treatment at South Down medical facility;

BB.    Diocese of Jackson records and/or communications concerning any payment for VARGAS' cancer treatment;

CC.    Any and all records and/or communications relating to VARGAS' personal expenditures; and

DD.    Any and all records pertaining to VARGAS' trips to Mexico and Canada.

## ELECTRONIC DEVICES

63.    Based on training and experience, your affiant knows that Electronic Devices may be utilized by one engaging in the Target Offenses in two distinct and important respects: (1) as instrumentalities for the violations of federal laws enumerated herein, and (2) as devices used in conjunction with the collection and storage of electronic data and records.  Search and seizure of Electronic Devices, either as instrumentalities of criminal activity or as storage devices for evidence thereof, is contemplated.

64.    In order to completely and accurately retrieve data maintained in Electronic Devices, and to insure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some Electronic

Devices be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

A.     The volume of evidence. Electronic Devices (such as hard disks, diskettes, tapes, laser disks, USB drives, thumb drives, Jaz drives, etc.) can store the equivalent of thousands of pages of information. Additionally, a user may seek to conceal criminal evidence by storing it in random order with deceptive file names. Searching authorities are thus required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data analysis "on-site."

B.     Technical requirements. Analyzing computer systems for criminal evidence is a highly technical process requiring specialized skills and a properly controlled environment. Since computer evidence is extremely vulnerable to tampering or destruction, a controlled environment is essential to its complete and accurate analysis.

65.     Reference to Electronic Devices includes the following technical terms to convey the following meanings:

A.     Any and all computer equipment, including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data. These devices include, but are not limited to, any data-processing hardware (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks and diskettes, tape drives and tapes, optical storage devices and other memory storage devices); peripheral input/output devices

(such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cable and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks).

B.     Computer software includes any and all information, including any instructions, programs, or program code, stored in the form of electronic, magnetic, optical, or other media which are capable of being interpreted by a computer or its related components. Computer software may also include certain data, data fragments, or control characters integral to the operation of computer software. This software commonly includes operating systems, other programs/applications (such as word-processing, graphics, spreadsheet, and database programs, and accounting and tax preparation software), utilities, compilers, interpreters, and communications programs.

C.     Computer passwords and data security devices are described as all those devices, programs, or data, whether themselves in the nature of hardware or software, that can be used or is designed for use to restrict access to or facilitate concealment of any computer hardware, computer software, computer-related documentation, electronic data, records, documents or materials within the scope of this application. These items include but are not limited to any data security hardware (such as any encryption devices, chips, circuit boards and dongles), passwords, data security software or information (such as test keys and encryption codes), and similar information that is required to access computer programs or data or to otherwise render programs or data into a useable form.

29

D.     Any software and/or hardware if necessary to access, read, and print the information. This includes but is not limited to (a) operating system software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended for use to communicate with computer components; (b) any documentation and manuals that describe the software or hardware and give instructions on its installation and use; (c) any software or hardware based licensing schemes that restrict the access or operation of the software without such item; and (d) computer passwords and data security devices including any data security hardware or software (such as devices or software used to encrypt data) that is required to access computer programs or data or to otherwise render programs or data into a useable form.

E.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld electronic device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities enabling it to function as a computer.  These capabilities include: storing files as well as the names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  As a result, one can use his/her cellular telephone to take and save digital pictures and videos, such as pictures of Mexican orphanages or chapels.  One can utilize

his/her cellular telephone to send wire communications and order wire transfers of money. Wireless telephones may also include geolocation technology for determining the location of the device, or the location of where the device has traveled. Such geolocation technology may also be able to determine the location that a picture was taken or video recorded, which was subsequently stored on the wireless or cellular telephone.

      F.    Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film, and is part of most cellular telephones. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the cellular telephone to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. This storage media can also contain digital data, including data unrelated to photographs or videos. Many cellular telephones contain digital camera technology.

      G.    Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

      H.    PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer

programs.  Some PDAs also function as wireless communication devices and are used to access

the Internet and send and receive e-mail.  PDAs usually include a memory card or other

removable storage media for storing data and a keyboard and/or touch screen for entering data.

Removable storage media include various types of flash memory cards or miniature hard drives.

This removable storage media can store any digital data.  Most PDAs run computer software,

giving them many of the same capabilities as personal computers.  For example, PDA users can

work with word-processing documents, spreadsheets, and presentations.  PDAs may also include

global positioning system ("GPS") technology for determining the location of the device.

> I.      Tablet:  A tablet is a mobile computer, typically larger than a phone yet

smaller than a notebook, primarily operated by touching the screen.  Tablets function as wireless

communication devices and can be used to access the Internet through cellular networks, 802.11

"wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like

programs on a personal computer, perform different functions and save data associated with

those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-

mail, and participating in Internet social networks.

> J.      Pager:  A pager is a handheld wireless electronic device used to contact an

individual through an alert, or a numeric or text message sent over a telecommunications

network.  Some pagers enable the user to send, as well as receive, text messages.

> K.      IP Address:  An Internet Protocol address (or simply "IP address") is a

unique numeric address used by computers on the Internet.  An IP address is a series of four

numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer

attached to the Internet computer must be assigned an IP address so that Internet traffic sent from

and directed to that computer may be directed properly from its source to its destination.  Most

Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

       L.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

66.     Based on my training and experience your affiant knows that Electronic Devices can store information for long periods of time. This information can sometimes be recovered with forensics tools.

67.     Based on training and experience, and knowledge of this investigation, your affiant knows that the contents of Electronic Devices have yielded information that is relevant and material to investigations of the Target Offenses; and asserts that there is probable cause to believe that Electronic Devices located in St. Joe Parish buildings, VARGAS' residence and the Diocese of Jackson stores evidence of the Target Offenses.

68.     Based on my training, and experience, and knowledge of this investigation, your affiant knows that individuals involved in the Target Offenses often use Electronic Devices, such computer equipment, wireless telephones, together with computer software and passwords, to store information and wire the proceeds of fraudulent schemes. Financial data is often kept on Electronic Devices. Wireless telephones are Electronic Devices capable of containing evidence of Target Offenses. The internet, as evidenced by IP addresses, is also utilized to store information that will prove to be evidence of criminal activity. I also know that individuals committing Target Offenses often generate and store communications they send or intend to send

on Electronic Devices.  In the instant case, information related to the Target Offenses may be located on Electronic Devices located in the Parish Office, VARGAS' residence and Diocese of Jackson offices.

69.     There is probable cause to believe that things that were once stored on the Electronic Devices may still be stored there, for at least the following reasons:

A.     Based on knowledge, training, and experience, your affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

B.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

C.     Wholly apart from user-generated files, Electronic Devises and computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because

34

special software is typically required for that task. However, it is technically possible to delete this information.

        D.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

    70.    Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Electronic Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Electronic Devices because:

        A.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

        B.     Forensic evidence on the Electronic Devices can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

35

C.     A person with appropriate familiarity with how the Electronic Devices work may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the Electronic Devices were used, the purpose of their use, who used them, and when.

D.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

71.     Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Electronic Devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

72.     Based on the aforementioned facts and circumstances, your affiant has probable cause to believe that evidence of Lenin VARGAS and the Diocese of Jackson's involvement in the Target Offenses will be found at the premises and vehicles described herein and in Attachment A hereto.


William G. Childers
Special Agent, HSI


Subscribed and sworn before me this __6th__ of __NOVEMBER__, 2018.


UNITED STATES MAGISTRATE JUDGE

37